# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

Bryan Dryden,

      Petitioner

v.

Calvin Johnson, et al.,

      Respondents

Case No. 2:17-cv-00704-JAD-NJK

**Order Denying Petition for Habeas Relief and Closing Case**

Petitioner Bryan Dryden was convicted by guilty plea of second-degree murder in Nevada State Court and sentenced to life imprisonment with eligibility for parole after 10 years.[1] In the two remaining grounds of his first-amended petition, Dryden seeks a writ of habeas corpus under 28 U.S.C. § 2254 based on claims his guilty plea was not knowing, voluntary, and intelligent and his counsel was ineffective in the investigation of DNA evidence.[2]  I now address these claims on their merits.  Because I find habeas relief is not warranted, I deny Dryden's petition, deny him a certificate of appealability, and close this case.

## Background[3]

### A.    The facts underlying Dryden's conviction

Mark Raso testified he was homeless and acquainted with Dryden, Kimberly Becker, and Patrick Kelly, who lived at a neighboring homeless camp.[4]  Raso was at a nearby gas station on June 20, 2009, when he saw Dryden "threatening" Kelly "for trying to steal his girlfriend

---

[1] ECF No. 25-10.

[2] ECF No. 15.

[3] Except where noted, these facts are taken from the preliminary hearing transcript. ECF Nos. 23-1; 27-18 at 96.  For simplicity's sake, I cite these exhibits generally for this entire fact section. I make no credibility findings or other factual findings regarding the truth or falsity of this summary of the evidence from the state court.  This summary is merely a backdrop to my consideration of the issues.

[4] ECF No. 27-18 at 97–99.

[Becker]."[5]  Raso saw Dryden shove Kelly and heard him say "he was going to beat the hell out of him and leave a knife in his neck."[6]

Nicholas Werner Halstead testified he was driving a cement mixer at about 8:45 p.m. on June 22, 2009, when he saw "one man struggling with what looked like . . . somebody underneath him on the ground."[7]  Halstead said it looked like the man "had a pretty good choke hold" on someone underneath him and was "struggling to keep somebody down."[8]  The man on top had the man on the bottom in a "full Nelson," which is a wrestling maneuver he described as "two arms basically kind of wrapped around at least underneath somebody else's arms with their head in a headlock forcing them into submission."[9]  Halstead could not see the individual underneath but saw a third person "attempting to kick" the man on top.[10]

Kelly Marie Smith testified that sometime after "8 or 9" on the night of June 22, 2009, Dryden appeared at her apartment "covered in blood from head to toe" and "was just crazy, like he was going to hit the ground" and "faint."[11]  She knew Dryden because he was a previous neighbor at her apartment complex.[12]  Smith asked Dryden what happened to him, and Dryden replied, "They raped Kimberly.  I just killed two men.  They are in the alley dead."[13]  Smith cleaned Dryden's eye wound, noticed his hands were cut and swollen, provided him a change of clothes, and then she, her roommate, and her boyfriend made Dryden leave.[14]

---

[5] *Id.* at 98, 100.

[6] *Id.* at 98–99.

[7] *Id.* at 102–03.

[8] *Id.* at 103, 105.

[9] *Id.* at 103–04.

[10] *Id.* at 103.

[11] *Id.* at 107–08.

[12] *Id.* at 106–07.

[13] *Id.* at 108.

[14] *Id.* at 108–09.

Homicide detectives McNett and McCarthy recorded an interview with Dryden following Dryden's acknowledgement of written *Miranda* warnings.[15]  McNett testified Dryden was forthright in his version of events although he occasionally required refreshment of his memory.[16]  McNett asked Dryden whether he had been drinking, and Dryden said "No" but acknowledged he suffered from a mental illness and was not taking his medication.[17]  McNett said Dryden appeared "completely lucid" and did not appear under the influence of anything.[18]

According to McNett, Dryden said that he confronted Kelly at a market "because he was trying to get to the bottom of who was causing [Becker] harm."[19]  Dryden asked Kelly questions about what happened to Becker at the camp while Dryden was incarcerated because Becker said several men attacked her in his absence.[20]  Dryden said that on the day Kelly died, he heard Becker screaming and went to investigate.[21]  Dryden said Kelly "jumped out of the bush at him," punched him in the eye, and knocked him to the ground, so Dryden "attacked him."[22]  McNett confirmed that Dryden had a cut on his eye during the interview.[23]  Dryden said he realized Kelly might be the person responsible for the attacks on Becker.[24]  Dryden said he "[h]e got back up and started to fight with [Kelly]," knocked Kelly to the ground, and recalled "being on top of him, striking him repeatedly."[25]  Dryden said he "blacked out" and did not recall choking

---

[15] *Id.* at 111–13.

[16] *Id.* at 113, 115.

[17] *Id.* at 116–17.

[18] *Id.*

[19] *Id.* at 114.

[20] *Id.* at 114–15.  The parties stipulated that Dryden was incarcerated for a misdemeanor from May 9, 2009, to June 15, 2009.  ECF No. 62 at 28.

[21] *Id.* at 113.

[22] *Id.*

[23] *Id.* at 115.

[24] *Id.* at 114.

[25] *Id.* at 113–14.

Kelly.[26]  Dryden said that upon realizing Kelly was dead, he went to an apartment where he cleaned-up, changed clothes, and deposited the clothes he wore during the altercation with Kelly into a dumpster at the apartment complex.[27]

Pathologist Lary Sims conducted the autopsy of Kelly's body and found "over a hundred injuries."[28]  Strangulation injuries included "bruises and abrasions on his neck" but no evidence of a ligature.[29]  Internally, strangulation injuries consisted of "multiple hemorrhages in the soft tissues, all the way from the front of the neck to the back of the neck" including a "fracture of his thyroid cartilage, which is the voice box or larynx," which "indicates significant compression force applied to the voice box area."[30]  Sims found petechial hemorrhages on Kelly's eyes "that could be due to strangulation or blunt force trauma" to his eyes.[31]  Sims found 69 external injuries, two-thirds of which occurred on Kelly's head and neck, and others on his upper chest, back, and hands.[32]  Kelly also had fractures to his nasal spine and ribs.[33]

Sims opined that the cause of Kelly's death was strangulation with multiple blunt force injuries as a significant contributing condition.[34]  The strangulation was consistent with hands and an additional mechanism, such was "[a]n arm bar, a knee, foot, those kind of other mechanisms that would really bring a significant amount of force to the neck."[35]  The strangulation could have been caused by a knee pressed on the neck for a period of time to bring

---

[26] *Id.* at 114.

[27] *Id.* at 114–15.

[28] ECF No. 23-1 at 4.

[29] *Id.* at 4–5.

[30] *Id.* at 5.

[31] *Id.*

[32] *Id.* at 4–5.

[33] *Id.* at 5.  Kelly's blood-alcohol level was a .24, three times the legal limit for driving, and trace levels of Valium were found in his liver.  *Id.* at 5–6.

[34] *Id.* at 6.

[35] *Id.* at 9.

about the kind of pressure that would cut off air flow.[36]  Once blood flow is cut off through the carotid arteries, Sims said it takes only about 10 to 15 seconds to go unconscious, and about 3 to 5 minutes to induce brain injury and death.[37]  Sims said "it only takes about ten pounds of pressure to cut off the carotid arteries, which is basically a choke hold kind of a thing."[38]

**B.   Procedural history**

On February 7, 2011, Dryden was convicted by guilty plea of second-degree murder.[39] He was sentenced to life imprisonment with parole eligibility after 10 years.  He appealed and the Nevada Supreme Court affirmed, finding the state district court should have appointed alternative counsel for Dryden's motion to withdraw his guilty plea but discerning no error because Dryden's explanations did not demonstrate trial counsel was coercive and Dryden failed to demonstrate his medication affected his ability to enter a knowing, voluntary, and intelligent guilty plea.[40]  Dryden then filed a state habeas petition, which was denied by the state district court[41] and affirmed by the Nevada Court of Appeals.[42]

Dryden filed a *pro se* federal habeas petition and a counseled first-amended petition.[43] The respondents moved to dismiss that first-amended petition, and I granted the motion in part, dismissing ground C as unexhausted, and gave Dryden an opportunity to determine how he wished to proceed on the mixed petition.[44]  Dryden then abandoned ground C and stated he

---

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] ECF No. 25-10.

[40] ECF No. 25-28.

[41] ECF No. 26-35.

[42] ECF No. 27-44.

[43] ECF No. 15.

[44] ECF No. 36.

wished to proceed on the remaining claims.[45]  The respondents answered the remaining

grounds—grounds A and B—and Dryden replied.[46]

**Discussion**

**A.    Legal standards**

    *1.    Review under the Antiterrorism and Effective Death Penalty Act (AEDPA)*

       If a state court has adjudicated a habeas corpus claim on its merits, a federal district court

may only grant habeas relief with respect to that claim if the state court's adjudication "resulted

in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision

that was based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceeding."[47]  A state court acts contrary to clearly established federal law if it

applies a rule contradicting the relevant holdings or reaches a different conclusion on materially

indistinguishable facts.[48]  And a state court unreasonably applies clearly established federal law

if it engages in an objectively unreasonable application of the correct governing legal rule to the

facts at hand.[49]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court

precedent "to a new context where it should apply" or "license federal courts to treat the failure

to do so as error."[50]  The "objectively unreasonable" standard is difficult to satisfy;[51] "even

'clear error' will not suffice."[52]

---

[45] ECF No. 40.

[46] ECF Nos. 49; 58.

[47] 28 U.S.C. § 2254(d).

[48] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[49] *White v. Woodall*, 572 U.S. 415, 424–27 (2014).

[50] *Id.*

[51] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[52] *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.") (quoting *Williams v. Taylor*, 529 U.S. 362, 410

Habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[53] "As a condition for obtaining habeas relief," a petitioner "must show that the state-court ruling on the claim being presented" "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[54] "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[55] "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' . . . 'and demands that state-court decisions be given the benefit of the doubt.'"[56] The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[57] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[58]

### 2.    Standard for federal habeas review of an ineffective-assistance claim

The right to counsel embodied in the Sixth Amendment provides "the right to the effective assistance of counsel."[59] Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render 'adequate legal assistance[.]'"[60] In the hallmark case of *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance claim requires a petitioner to show: (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the

_____

(2000).

[53] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[54] *Id.* at 103.

[55] *Id.* at 101.

[56] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[57] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[58] 28 U.S.C. § 2254(e)(1).

[59] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[60] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344, 345–50 (1980)).

circumstances of the particular case;[61] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[62]

A reasonable probability is "probability sufficient to undermine confidence in the outcome."[63]  Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[64]  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practice or most common custom."[65]  The burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy decisions.[66]

The United States Supreme Court has described federal review of a state supreme court's decision on an ineffective-assistance claim as "doubly deferential."[67]  So, this court must "take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'"[68]  And it must consider only the record that was before the state court that adjudicated the claim on its merits.[69]

The Supreme Court, applying *Strickland* to counsel's advice in plea negotiations, has held that when a defendant enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice "was within the range of competence demanded of

---

[61] *Strickland*, 466 U.S. at 690.

[62] *Id.* at 694.

[63] *Id; see also Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

[64] *Strickland*, 466 U.S. at 689.

[65] *Id.* at 690.

[66] *Richter,* 562 U.S. at 104.

[67] *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) (per curiam))).

[68] *Pinholster,* 563 at 190.

[69] *Id.* at 181–84.

attorneys in criminal cases."[70]  When the ineffective-assistance-of-counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires the petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[71]

**B.    Evaluating Dryden's remaining claims under these standards**

     *1.    Ground A—Guilty Plea*

        In ground A, Dryden alleges his guilty plea was not knowing, voluntary, and intelligent, in violation of due process under the Fifth and Fourteenth Amendments because (1) he never admitted the necessary facts to support his guilty plea; (2) his mental illness and improper use of his medications left him unable to understand the plea; (3) he asserted his innocence after he entered his guilty plea; and (4) his counsel coerced him to accept the plea agreement by failing to test the DNA of an individual Dryden believes is Kelly's killer and falsely advising Dryden the individual's DNA was excluded as a contributor for DNA found at the scene of Kelly's death.[72]

        *a.    History of this ground*

           *i.    Guilty Plea Agreement*

        Dryden was charged with open murder for Kelly's death.[73]  On February 7, 2011, he signed an agreement in open court agreeing to plead guilty to one count of second-degree murder, pursuant to a second amended information, attached to the plea agreement as Exhibit 1.[74]  The parties jointly recommended a sentence of life imprisonment with parole eligibility

---

[70] *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (citing *McMann,* 397 U.S. at 771).

[71] *Id.* at 59; *see also Lafler v. Cooper*, 566 U.S. 156, 163 (2012) ("In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice.").

[72] ECF No. 15 at 8–10.

[73] ECF No. 23-35.

[74] ECF No. 24-28 at 2, 8–9.  The plea agreement indicates that Dryden signed it on January 7, 2011, however, since he entered his guilty plea on February 7, 2011, and the plea agreement was signed in open court on the date he entered his guilty plea, this appears to constitute a typographical error.  ECF Nos. 24-28 at 2, 6; 24-34 at 2, 4.

9

after 10 years.[75]  In the agreement, Dryden admitted "the facts which support all the elements of the offense(s)" as set forth in Exhibit 1,[76] which alleged Dryden killed Kelly with malice aforethought by "strangling" him "and/or by repeatedly punching him in the face and/or stomping" on his face with his foot and/or "dropping" his knee onto his face.[77]

In a section of the agreement entitled "VOLUNTARINESS OF PLEA," Dryden attested: "I discussed the elements of all of the original charge(s) against me with my attorney and I understand the nature of the charge(s) against me."[78]  Dryden further agreed: "I have discussed with my attorney any possible defenses, defense strategies and circumstances which might be in my favor," and his attorney "thoroughly explained" to him "[a]ll of the foregoing elements, consequences, rights, and waiver of rights" set forth in the agreement.[79]  Dryden confirmed his attorney "answered all of [his] questions" regarding the agreement and its consequences to his satisfaction and he was satisfied with his attorney's services.[80]  Dryden affirmed that he believed "pleading guilty and accepting this plea bargain" was in his "best interest," and "a trial would be contrary to [his] best interest."[81]

Dryden confirmed in the agreement that he signed it "voluntarily" after consulting his attorney and was "not acting under duress or coercion or by virtue of any promises of leniency, except for those set forth in the agreement."[82]  He further confirmed he was not then "under the influence of any intoxicating liquor, a controlled substance or other drug which would in any manner impair [his] ability to comprehend or understand this agreement or the proceedings

---

[75] ECF No. 24-28 at 2.

[76] *Id.* at 3.

[77] *Id.* at 8–9.

[78] *Id.* at 5.

[79] *Id.*

[80] *Id.* at 6.

[81] *Id.*

[82] *Id.*

surrounding [his] entry of this plea."[83]  By signing the agreement, Dryer attested he understood

that by pleading guilty and accepting the plea bargain, he forever gave up his rights to a speedy

jury trial, to testify, to remain silent, to call witnesses, to confront witnesses, to appeal, and to

counsel "throughout all critical stages of the proceedings."[84]

Defense counsel signed an attached certificate attesting that she "fully explained" to

Dryden the penalties and allegations to which his guilty pleas would be entered.[85]  Counsel

confirmed Dryden's guilty plea was "consistent with the facts known" to counsel and the plea

was made with counsel's advice.[86]  To the best of counsel's knowledge and belief, counsel

confirmed Dryden was "competent" and "[w]as not under the influence of intoxicating liquor, a

controlled substance or other drug" when counsel advised Dryden about the agreement.[87]

Counsel confirmed Dryden understood "the charges and consequences of pleading guilty as

provided in the agreement," Dryden executed the agreement, and Dryden would "voluntarily"

plead guilty.[88]

### ii.    *Entry of Guilty Plea*

At his February 7, 2011, change-of-plea hearing Dryden stated he understood the

negotiations, had no questions for counsel or the state district court, and wished to plead guilty to

second-degree murder.[89]  The court inquired whether Dryden was then taking medication and

whether it affected his competency or ability to understand the proceedings:

> THE COURT: Now, let me explain something to you sir.  During our earlier
> discussion about these various motions, pretrial motions, there was some
> indication that you are on medications?

---

[83] *Id.*

[84] *Id.* at 5.

[85] *Id.* at 7.

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] ECF No. 24-34 at 4, 6.

THE DEFENDANT:  Yes, sir.

THE COURT: Now, are you currently taking medications?

THE DEFENDANT: Yes, sir.

THE COURT: Do you feel that you're competent and understand what's going on here?

THE DEFENDANT: Yes, sir.

THE COURT: Do you have any hesitancy in that regard?

THE DEFENDANT: No, sir.

THE COURT: So you feel like you want to go forward today?

THE DEFENDANT: Yes, sir.[90]

Dryden then pleaded guilty to second-degree murder; agreed his plea was freely and voluntarily given; and confirmed he read, signed, and understood the plea agreement.[91]  Dryden also agreed that it was his belief the negotiations were in his best interest given the facts of the case.[92]  The court then asked Dryden about the factual basis for his guilty plea:

THE COURT: Sir, what did do [sic] on or about the 22nd day of June of the year 2009 that caused you to enter a plea of guilty to the charge of second degree murder?

THE DEFENDANT: Well, to tell you the truth, I really can't remember what happened.  All I remember is dropping my knee into Patrick's head and thinking that he was the one who attacked me.  And I fought back in self-defense, but the end result was Patrick was ended [sic] up dead.

THE COURT: [Defense counsel], are the circumstances such that it would not amount to the legal defense of self-defense?

DEFENSE COUNSEL: Yes.

THE COURT: And, Mr. Dryden, you and this Mr. Kelly got into a fight; is that correct?

THE DEFENDANT: I was attacked.

---

[90] *Id.* at 4–5.

[91] *Id.* at 5–6.

[92] *Id.* at 6.

THE COURT: Sir, you got into a fight though, you fought each other, right?

THE DEFENDANT: I don't remember actually fighting Patrick because my vision was blacked out from getting hit in the temple.

THE COURT: How do you remember you were attacked, but you don't remember you were in a fight?

THE DEFENDANT: I know that I was attacked.

THE COURT: How do you know that if you don't remember?

THE DEFENDANT: Well, I don't remember exactly what happened before I was attacked.

THE COURT: Oh, so as soon as you were attacked your memory failed you?

DEFENSE COUNSEL: If I could, Judge, it would be fair to say that he remembers bits and pieces from that night, and he does know that he did put his knee into the head of Patrick Kelly and, in fact, that's what he told the police when he was interviewed.

THE COURT: And that action along with some others perhaps, he [sic] was responsible for the death of Mr. Kelly?  Is that correct, sir?

THE DEFENDANT: As far as I know, yes.  He was also strangled.  I didn't have any—I don't believe I had anything to do with that.

THE COURT: Well, sir, what you're pleading to is that you repeatedly punched Mr. Kelly in the face, and/or stomped him in the face with your foot, and/or dropping onto his face with your knee.  Is there any reason to believe that these things are not what actually occurred?

THE DEFENDANT: I remember dropping my knee into Patrick's head.

THE COURT: Is there any reason to believe that these other things did not occur?  Do you recall one way or the other?

THE DEFENDANT: What's that?

THE COURT: Is there any reason to believe that these actions you pled to did not occur?

THE DEFENDANT: No.

THE COURT: The Court finds the defendant's plea of guilty is freely and voluntarily given, that the defendant understands the nature of the offense and the consequences of his plea.  I, therefore, accept the plea of guilty.[93]

---

[93] *Id.* at 6–9.

13

### iii. Motion to Withdraw Guilty Plea

On April 11, 2011, Dryden, through is counsel, moved for appointment of alternative counsel to determine whether grounds existed to permit Dryden to withdraw his guilty plea.[94] Counsel explained that Dryden intended to argue counsel "did not provide him with adequate advice and representation at the time of plea."[95]   The court denied the request to appoint alternative counsel.[96]   Dryden, through his counsel, subsequently filed his handwritten motion requesting withdrawal of his guilty plea based on (1) intoxication/withdrawal symptoms at the time of the plea; (2) incompetency/mental illness affecting his plea colloquy; and (3) allegations of innocence.[97]   Dryden thereafter, through his counsel, filed a handwritten addendum to his motion, additionally requesting withdrawal of his guilty plea on the grounds his counsel coerced him to plead guilty that and newly discovered evidence supported innocence.[98]

On June 1, 2011, the state district court held a hearing on the motion to withdraw the guilty plea, and the State noted it was Dryden "who wanted the negotiation" after the court ruled on ten pretrial motions and the parties were "set to go" to trial.[99]   Defense counsel stated Dryden had "second thoughts" about whether the guilty plea was the right thing to do "very quickly" after he entered the plea, and they discussed it for a significant time prior to filing the motion to withdraw the plea.[100]

Counsel informed the court that following the guilty plea, Dryden told counsel he failed to take his medication for up to a week prior to the day he pleaded guilty and only

---

[94] ECF No. 24-36 at 3.

[95] Id.

[96] ECF No. 24-38 at 3–4.

[97] ECF No. 25-1 at 7.

[98] ECF Nos. 25-3 at 3.

[99] ECF No. 25-6 at 4–5.

[100] Id. at 9.

resumed his medication the morning of his guilty plea.[101]   Dryden told the court he was

"overwhelmed by the medication."[102]   Dryden also stated counsel coerced him to plead

guilty by telling him he "needed to take the plea bargain" because, in counsel's opinion,

the jury would not believe Dryden's defense.[103]   Dryden told the court he believed he

could convince a "jury to believe what the truth is, which is that there was another person

there."[104]   The parties then engaged in the following exchange concerning Dryden's

ability to understand the proceedings when he pleaded guilty:

> THE DEFENDANT: Your Honor, I did not murder Patrick.
>
> THE COURT: Well, why did you—you entered a plea and said you did.  Do you remember that part?
>
> THE DEFENDANT: That's because I was going with [defense counsel's] best—
>
> THE COURT: You were talking to me, not [defense counsel].  I asked you are you pleading guilty because in truth and in fact you are guilty, and you said yes.  Did [defense counsel] have your arm twisted behind your back there?
>
> THE DEFENDANT: No.
>
> THE COURT: What made you say yes then?
>
> THE DEFENDANT: Because I was afraid that I would get 20 to life in trial.
>
> THE COURT: That's exactly right.  That's part of what you need to consider when you enter a plea and try to get a lesser sentence, I understand that.
>
> THE DEFENDANT: But I did not murder Patrick.  The real killer's blood is at the scene, and there's proof that there's another person's blood at the scene, Your Honor.
>
> THE COURT: Did you have—
>
> DEFENSE COUNSEL: There is a droplet of blood that remains unidentified, that is accurate, Judge.
>
> . . . .

---

[101] *Id.* at 3.

[102] *Id.* at 4.

[103] *Id.* at 4–5.

[104] *Id.* at 5.

THE COURT: Now, Mr. Dryden, let me explain a couple of things to you. Number one, this medication issue, it tends to be kind of a catch-22 in the sense that oftentimes you'll hear defendants say:

Well, I didn't know what I was doing because I hadn't taken my medication. I hadn't taken my medication because I've been in jail and didn't have access to the medication so I didn't know what I was doing.

Or if you give them medication, they say: Well, I didn't know what I was doing, I was on medication. So there's no way to win this thing, you see, except do what I did, and that is to have a discussion, a conversation to determine in [sic] you're lucid, you can understand what I'm saying and you can respond in a sensible way.

And that's what I went about trying to determine, and I determined that you were capable of understanding what was going on.

THE DEFENDANT: I was just answering the questions just to make it easier for me because I was having a hard time.

THE COURT: See, I can't define what your motivations were, all I can do is go through the process. We went through a lengthy canvass to try and determine if you knew what you were doing, and you answered right down the line; Yeah, I sure do, I know what I'm doing, no questions, and on and on, signed the Guilty Plea Agreement, and I see no basis to withdraw the plea. So I'm going to deny your motion and set it for sentencing.[105]

### iv.   Sentencing

At sentencing on June 20, 2011, the state district court asked whether there was any legal cause or reason why judgment should not be pronounced at that time and Dryden stated, "Because I'm not guilty."[106] The court adjudged Dryden guilty by virtue of his guilty plea and following colloquy occurred:

THE COURT: Mr. Dryden, is there anything you want to say before your attorney speaks?

THE DEFENDANT: I was sadly mistaken when I seen [sic] Patrick in front of me with his head and the injuries on him. I was attacked with my vision knocked out after getting hit in the temple.

Once my vision came through I seen [sic] Patrick on the ground, I [sic] assumed that I was responsible for his injuries. But the person that attacked and killed Patrick was to the left of me, and I was in shock and assumed that I had done that to Patrick.

---

[105] *Id.* at 5–7, 10–11.

[106] ECF No. 25-8 at 3.

> But I now know that Patrick was killed and the person that attacked him then attacked me.  And I was in such shock that I took off to go get help, and I was talked out of going back to the scene by my friends.

THE COURT: Well, Mr. Dryden, didn't Patrick sleep with your girlfriend?

THE DEFENDANT: No.  Well, he might have been [sic], I'm not sure.

THE COURT: Weren't you mad at him because of that?

THE DEFENDANT: I thought that that's what had happened.

THE COURT: That's what you thought?

THE DEFENDANT: Well, I thought that I went into a blackout rage, but I didn't.

THE COURT: I'm talking about your girlfriend.  Did he sleep with your girlfriend?

THE DEFENDANT: I'm not sure.

THE COURT: Well, but you thought he did, didn't you?

THE DEFENDANT: That's when [sic] I was thinking that's maybe why I had done [sic] something to him, but that's not what the case is [sic].

THE COURT: This other person who attacked you and he, why did he do that?

THE DEFENDANT: I'm not sure.  I have no idea.[107]

After noting Dryden had five prior assault-and-battery convictions and numerous narcotics offenses, the state district court sentenced Dryden, consistent with the plea agreement, to life imprisonment with parole eligibility after ten years.[108]  The court stated, "I agree with [Dryden's] family members, I don't think you should ever get out of prison."[109]

### v.    *The Nevada Supreme Court's Determination*

In his state court direct appeal, Dryden claimed the state district court violated his right to conflict-free counsel by denying his request to appoint alternative counsel to represent him for

---

[107] *Id.* at 3–5.

[108] *Id.* at 14.

[109] *Id.*

the motion to withdraw his guilty plea.[110]  The Nevada Supreme Court denied that claim and on its own initiative additionally affirmed the state district court did not erroneously deny Dryden's motion to withdraw his guilty plea.[111]  In doing so, the Nevada Supreme Court addressed Dryden's allegations that his plea was not voluntary, knowing, and intelligent due to counsel's coercion and the effects of his medication:

> Dryden argues that the district court abused its discretion by denying his proper person motion to withdraw his guilty plea without appointing alternative counsel where the motion was based on claims that counsel coerced the plea and he was intoxicated at the time of the plea.  We disagree.
>
> Guilty pleas are presumptively valid, especially when entered on advice of counsel, and a defendant has a heavy burden to show the district court that he did not enter his plea voluntarily.  Crawford v. State, 117 Nev. 718, 722, 30 P.3d 1123, 1126 (2001); Barajas v. State, 115 Nev. 440, 442, 991 P.2d 474, 476 (1999).  "A district court may, in its discretion, grant a defendant's [presentence] motion to withdraw a guilty plea for any 'substantial reason' if it is 'fair and just.'"  Woods v. State, 114 Nev. 468, 475, 958 P.2d 91, 95 (1998) (quoting State v. District Court, 85 Nev. 381, 385, 455 P.2d 923, 926 (1969)).  A district court must examine the totality of the circumstances to determine whether a defendant entered his plea voluntarily.  Crawford, 117 Nev. at 721-22, 30 P.3d at 1125–26.  "A thorough plea canvass coupled with a detailed, consistent, written plea agreement supports a finding that the defendant entered the plea voluntarily, knowingly, and intelligently."  Id. at 722, 30 P.3d at 1126.  "When reviewing a district court's denial of a motion to withdraw a guilty plea, this court presumes that the district court properly assessed the plea's validity, and we will not reverse the lower court's determination absent abuse of discretion."  Id. at 721, 30 P.3d at 1125.
>
> We conclude that Dryden has failed to substantiate his coercion claims.  First, the district court canvassed Dryden on his understanding of the proceedings, the nature of the charges, and the possible penalties.  Second, Dryden signed a plea agreement memorializing the negotiations and attesting that his plea was not coerced.  Third, during the canvass, he admitted his guilt and claimed to enter the plea voluntarily.  Fourth, while the court should have appointed Dryden counsel at the hearing to withdraw the guilty plea, we discern no error because Dryden's explanations did not remotely demonstrate that his attorney was coercive.

---

[110] ECF No. 25-24 at 6–12.

[111] ECF No. 25-28.  Ordinarily, a habeas petitioner must "present the state courts with the same claim he urges upon the federal court."  *Picard v. Connor*, 404 U.S. 270, 276 (1971).  By addressing the unbriefed claim on its own initiative, the Nevada Supreme Court appears to have intentionally departed from the party presentation principle.  *See, e.g., Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008) ("To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a *pro se* litigant's rights.") (citation omitted).

Here, Dryden admitted that he had discussed with his attorney the State's evidence and the charges and elements the State would have to establish at trial. He claims that his attorney was coercive because she told him he "needed to take the plea because she didn't believe that anybody would understand the truth of what had happened." The district court later asked why Dryden had pleaded guilty. He replied, "Because I was afraid that I would get 20 to life in trial." None of Dryden's reasons for pleading guilty show coercion. Accordingly, Dryden has not demonstrated a substantial reason that is fair and just for granting his motion to withdraw his guilty plea. Woods, 114 Nev. at 475, 958 P.2d at 95.

Dryden also argues that his plea was unknowing and involuntary because he was under the influence of psychiatric medication. We disagree. Here, the district court was aware of Dryden's medications. He was specifically canvassed on his medication use. During the canvass, Dryden claimed that he was taking his medication, but it was not affecting him. Dryden's counsel who had been monitoring Dryden's medication use for several years, also believed that her client was lucid enough to enter the plea. Further, Dryden signed a written plea agreement attesting that he was not under the influence of any controlled substance which would impair his comprehension or understanding of the plea. Accordingly, Dryden has failed to proffer a substantial reason that is fair and just for granting his motion to withdraw his guilty plea because of his medication. Id.

We therefore conclude that Dryden has failed to demonstrate the district court abused its discretion in denying the presentence motion to withdraw the guilty plea.[112]

### b.     Analysis

The Supreme Court has held that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."[113] "The voluntariness of [a petitioner's] plea can be determined only by considering all of the relevant circumstances surrounding it."[114] Addressing the "standard as to the voluntariness of guilty pleas," the Supreme Court explained:

[A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable

---

[112] ECF No. 25-28.

[113] See Brady v. United States, 397 U.S. 742, 748 (1970); Boykin v. Alabama, 395 U.S. 238, 242 (1969).

[114] Id. at 749 (citations omitted).

promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).[115]

"[T]he representations of the defendant, his lawyer, and the prosecutor [at a plea hearing], as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings" because "[s]olemn declarations in open court carry a strong presumption of verity."[116]  A habeas petitioner bears the burden of establishing his guilty plea was not voluntary and knowing.[117]

The record tis court must consider in evaluating Dryden's claim is the record that was before the Nevada Supreme Court when it adjudicated this claim on direct appeal.[118]  Upon reviewing that record, I conclude the Nevada Supreme Court's determination was neither contrary to nor an unreasonable application of Supreme Court authority and was not based on an unreasonable determination of the facts.  Dryden's claim that his medication rendered him unable to understand his actions in pleading guilty is unsubstantiated and contrary to the record.  In his signed plea agreement, Dryden confirmed he entered into the agreement "voluntarily" and was not "under the influence of any . . . drug which would in any manner impair [his] ability to comprehend or understand this agreement or the proceedings surrounding [his] entry of plea."  Counsel, who had represented Dryden since 2009, signed certificate confirming that, to the best

---

[115] *Id.* at 755 (citation and footnote omitted); *see also North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (noting the longstanding "test for determining the validity of guilty pleas" is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.").

[116] *Blackledge v. Allison,* 431 U.S. 63, 73–76 (1977) (further nothing in the context of a challenge to a guilty plea, "the subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.").

[117] *See Little v. Crawford*, 449 F.3d 1075, 1080 (9th Cir. 2006) (citing *Parke v. Raley,* 506 U.S. 20, 31–34, (1992)).

[118] *See Pinholster*, 563 U.S. at 181–83.  Because Dryden's prison, medical, and psychiatric records, which may have been presented in his state postconviction review proceedings, were not presented to the state district court for the proceedings on Dryden's motion to withdraw his guilty plea or in his direct appeal to the Nevada Supreme Court, this court may not consider those records in reviewing ground A.  *See* ECF Nos. 43; 43-1; 43-2; 43-3; 43-4; 43-5; 43-6; 43-7; 43-8; 43-9.

of counsel's knowledge, Dryden was lucid, competent, understood the charges and consequences of pleading guilty, voluntarily executed the agreement, would voluntarily enter the guilty plea, and was not adversely affected by the any drug when counsel consulted with Dryden about the charges and penalties.  At the change-of-plea hearing, Dryden told the court he was taking medication but assured the court he was competent, understood his plea negotiations, and lacked any hesitancy about proceeding with the guilty plea.  Dryden further confirmed that he'd read, understood, and signed the plea agreement before pleading guilty and agreed he entered his guilty plea freely and voluntarily.

At the hearing on Dryden's motion to withdraw his guilty plea, counsel represented that Dryden had "second thoughts" immediately after entering his guilty plea and claimed he stopped taking his medication and only resumed medication on the morning of his guilty plea hearing. Dryden told the court he was "overwhelmed by the medication" but admitted he pleaded guilty because his counsel doubted the jury would believe another individual killed Kelly and Dryden was afraid of the possibility that he could be sentenced to 20 years to life if he lost at trial. Dryden's self-serving statements to counsel and the court following his guilty plea contradict his representations in his plea agreement and plea colloquy and are unsubstantiated by any specific evidence at the time the state district court denied the motion to withdraw the guilty plea and the Nevada Supreme Court affirmed on direct appeal.  Plus, Dryden demonstrated he was fully aware of the consequences of his guilty plea and that he had the capacity to voluntarily and intelligently chose among the alternatives available to him.

Likewise, Dryden's claim that trial counsel coerced him to enter the guilty plea is unsubstantiated and contrary to the record.  Dryden told the court that he'd read, understood, and signed his plea agreement, in which he confirmed he entered into the agreement "voluntarily" and was not acting "under duress or coercion."  Dryden reiterated at his change-of-plea hearing that his guilty plea was entered freely and voluntarily.  Dryden said he pleaded guilty because, in counsel's opinion, a jury would not believe that another person murdered Kelly, and because he was afraid that he would be sentenced to 20 years to life imprisonment had he lost at trial.  Thus, Dryden presented no evidence supporting allegations his guilty plea was induced by unkept

promises, misrepresentations, or threats.  As the Nevada Supreme Court reasonably determined, Dryden's explanations for his decision to plead guilty failed to demonstrate counsel coerced him to accept the plea agreement and plead guilty.[119]

For these reasons, the Nevada Supreme Court reasonably determined the record fails to substantiate Dryden's assertions that counsel coerced him to enter the guilty plea or that his medication undermined his capacity to make a voluntary and intelligent choice among the alternative courses of action open to him.  The Nevada Supreme Court reasonably applied Supreme Court authority in determining Dryden's guilty plea was voluntary, knowing, and intelligent.  Dryden is therefore not entitled to federal habeas relief for ground A.

## 2.    *Ground B—Ineffective Assistance of Counsel*

In ground B, Dryden alleges that he received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments because, prior to his guilty plea, trial counsel told him that William C. Huggins was excluded as a DNA contributor for unidentified DNA found at the scene of Kelly's death, when, in fact, counsel never compared Huggins's DNA with the unidentified DNA.[120]  Dryden claims that counsel performed deficiently by failing to obtain a court order to test Huggins's DNA because counsel's investigator placed Huggins in the vicinity of the crime and counsel's failure to compare Huggins's DNA with the unidentified DNA was nonstrategic.[121]  Dryden claims prejudice because, but for counsel's misrepresentation that Huggins's DNA was excluded, Dryden would have gone to trial.[122]

---

[119] *See, e.g., Iaea v. Sunn,* 800 F.2d 861, 867 (9th Cir. 1986) ("Mere advice or strong urging by third parties to plead guilty based on the strength of the state's case does not constitute undue coercion."); *Aguilar v. Field*, 423 F.2d 271 (9th Cir. 1970) (holding claim that petitioner was motivated by counsel's advice that he plead guilty to receive a shorter sentence did not warrant a hearing to determine whether the plea was the product of coercion, in absence of contention that petitioner's will was overborne or that he did not knowingly and willingly enter plea.)

[120] ECF No. 15 at 11–12.

[121] *Id.*

[122] *Id.* at 12.

### a.       History of this ground

At the preliminary hearing, at which Dryden was present, Halstead testified that, in addition to the man he saw holding down what he presumed was another man whom he did not see, he saw "another transient person" attempting to kick the man on top.[123]  A swab retrieved from the street curb at the crime scene tested positive for Kelly's DNA but negative for Dryden, Becker, and others, leaving open the possibility an unidentified male was present during the incident.[124]

At the postconviction evidentiary hearing, Dryden testified that he told his counsel "[r]ight from the get-go" that someone else was responsible for Kelly's death, but he could not recall whom.[125]  Dryden asked counsel to check with traffic and satellite surveillance videos, but counsel said they were unobtainable and there was no such thing.[126]  Dryden claimed he told counsel that Mitch Garrison "was involved" but claimed he never told counsel Garrison was the other person at the scene.[127]  Dryden said he told counsel it would be advantageous to exclude Garrison's DNA, but that was before Dryden encountered Huggins at the jail.[128]

Dryden testified that his memory of the incident returned in January 2010 and he recalled that, after he was hit in his temple, he saw Kelly and Huggins lying on the ground.[129]  Dryden testified that he ran into Huggins earlier on the day Kelly was killed and during the incident recalled that Huggins hit him before Dryden knocked Huggins out cold.[130]  Dryden said he ran

---

[123] ECF No. 27-18 at 103.

[124] *Id.* at 43, 45. ("The DNA profile obtained from a swab from the top of the curb (KP4A) is consistent with a mixture of two individuals. The source of the major DNA profile is [Kelly] . . . [Becker] and [Dryden] . . . are excluded as DNA contributors to the mixture.").

[125] *Id.* at 84.

[126] *Id.* at 85–86.

[127] *Id.* at 88.

[128] *Id.* at 128.

[129] *Id.* at 90.

[130] *Id.*

into Huggins at the jail on April 17, 2010, and spoke with him extensively.[131]   Dryden claimed

that Huggins came up to him, said, "Hey, do you know who I am?" and Dryden replied:

> Yeah, you're the guy that gave me change at a Terrible Herbst gas station right
> before me and Patrick went to camp with Kimberly, and I was just in another
> POD where I just prayed to God that I would run into you for a witness because
> the change you gave to me was found underneath Patrick Kelly's body after I
> gave it to him to go get some more beers when me and Kimberly were at the
> camp.[132]

Dryden testified that four days before he accepted the plea agreement, his counsel and

counsel's supervisor informed him that Huggins was "excluded because he's at High Desert and

he's been swabbed."[133]   Dryden said the only reason he accepted the plea agreement was because

he was told Huggins's DNA was excluded.[134]   At the postconviction evidentiary hearing,

Dryden's trial counsel testified she pursued many "unfruitful leads," and investigated "every

person that was involved in the case," but a lot of them were not found due to their homelessness

or their use of street names.[135]   And counsel's independent laboratory review of the State's entire

DNA protocol resulted in no glaring errors.[136]

Counsel testified that Dryden was "adamant, adamant, adamant" that Garrison was the

killer.[137]   Dryden told counsel that Garrison also killed another man, however, the relevant

records showed that victim was killed by a bus.[138]   Counsel said that Dryden dismissed this,

stating that Garrison had caused the victim's death by pushing or scaring the victim.[139]   Because

---

[131] *Id.* at 133.

[132] *Id.* at 134–35.

[133] *Id.* at 91–92.

[134] *Id.* at 103.

[135] ECF No. 26-18 at 28, 46–47.

[136] *Id.* at 24.

[137] *Id.* at 23; *see also* ECF No. 24-24 at 19.

[138] *Id.* at 47–48.

[139] *Id.*

Dryden was adamant that Garrison was the killer, and the State found unidentified male DNA mixed with Kelly's blood on a street curb at the scene of Kelly's death, counsel's investigator interviewed Garrison and surreptitiously obtained his DNA.[140]  When counsel later told Dryden that Garrison's DNA did not match the DNA found at the crime scene, Dryden was "stunned silent."[141]

Counsel said that, after about a month or so, Dryden told her he "remembered new things" and decided Huggins was Kelly's killer.[142]  Counsel said she interviewed Huggins, but it turned out he was at a nearby gas station.[143]  Counsel said Dryden responded to this news by claiming Huggins was lying and Dryden heard from unnamed individuals at the jail that Huggins admitted, "or kind of admitted," his guilt to them.[144]  Counsel was unable to locate any of those individuals.[145]  Counsel said "it was all very tenuous" and counsel did not see "any credible link between Huggins and the offense."[146]  Counsel explained a court order was necessary to obtain Huggins's DNA because Huggins was in custody.[147]  Counsel did not pursue an order because, among other reasons, counsel lacked "legitimate enough grounds" connecting Huggins to the crime.[148]  Unlike the collection of Garrison's DNA, counsel said a request for such an order would have alerted the prosecutor to Dryden's defense.[149]  Counsel was also concerned about pursuing a DNA test for Huggins because Dryden's assertions concerning Garrison turned out to

---

[140] *Id.* at 23–24.

[141] *Id.* at 25.

[142] *Id.* Counsel testified "[e]verything always changed." *Id.* at 48. Counsel said Dryden always responded to counsel's [negative] results by remembering "other details." *Id.*

[143] *Id.* at 25–26, 64. Counsel said Huggins ultimately went to prison on an unrelated matter.

[144] *Id.* at 26.

[145] *Id.*

[146] *Id.*

[147] *Id.* at 26–27.

[148] *Id.* at 27.

[149] *Id.*

be false.[150]  Counsel denied telling Dryden that Huggins's DNA was tested or that it was

excluded as a match for the DNA of the unidentified male found at the scene.[151]

Counsel testified there were problems investigating other possible suspects because

Dryden "had a hard time deciding whether or not some other person did it or whether it was a

self-defense kind of thing," and they struggled with those scenarios the entire time.[152]  Counsel

planned to "make a lot of hay" at trial with the truck driver's testimony that he saw a third person

at the scene and the presence of blood containing the unidentified male's DNA, although there

was no way to know when the unidentified male's DNA was deposited at the scene.[153]

The Nevada Court of Appeals denied this claim:

> Dryden argues the district court erred by denying his ineffective-
> assistance-of-counsel claims.  To prove ineffective assistance of counsel sufficient
> to invalidate a judgment of conviction based on a guilty plea, a petitioner must
> demonstrate that his counsel's performance was deficient in that it fell below an
> objective standard of reasonableness, and resulting prejudice such that there is a
> reasonable probability, but for counsel's errors, petitioner would not have pleaded
> guilty and would have insisted on going to trial.  *Hill v. Lockhart,* 474 U.S. 52,
> 58-59 (1985); *Kirksey v. State,* 112 Nev. 980, 988, 923 P.2d 1102, 1107 (1996).
> Both components of the inquiry must be shown.  *Strickland v. Washington,* 466
> U.S. 668, 697 (1984).  We give deference to the court's factual findings if
> supported by substantial evidence and not clearly erroneous but review the court's
> application of the law to those facts de novo.  *Lader v. Warden,* 121 Nev. 682,
> 686, 120 P.3d 1164, 1166 (2005).
>
> First, Dryden argued that counsel was ineffective for failing to investigate
> potentially exculpatory DNA evidence.  Specifically, Dryden argued counsel
> should have requested DNA testing of a person Dryden claimed was the actual
> person who killed the victim.  There were several unknown DNA samples taken
> from the scene of the crime and Dryden believed they would match the other
> person's DNA.  Dryden failed to demonstrate counsel was deficient or resulting
> prejudice.
>
> After holding an evidentiary hearing, the district court found counsel's
> decision not to further attempt to obtain and test the DNA of the other man was a
> reasonable strategy decision in light of the lack of credible information
> corroborating Dryden's new theory and the fact she had already obtained a DNA
> sample from another individual Dryden insisted was the real killer, whose DNA

---

[150] *Id.*

[151] *Id.* at 65.

[152] *Id.* at 27–28.

[153] *Id.* at 60–62.

did not match the samples found at the crime scene.  Substantial evidence supports the decision of the district court because the decision not to pursue this investigation was tactical and reasonable.  *See Molina v. State,* 120 Nev. 185, 192, 87 P.3d 533, 538 (2004) ("Where counsel and the client in a criminal case clearly understand the evidence and the permutations of proof and outcome, counsel is not required to unnecessarily exhaust all available public or private resources."); *Doleman v. State,* 112 Nev. 843, 847-48, 921 P.2d 278, 280-82 (1996) (tactical decisions are "virtually unchallengeable absent extraordinary circumstances"). Further, Dryden admitted to the police he had hit, stomped, and "knee dropped" the victim's head, and he only stopped hitting the victim when he realized the victim had stopped moving and was dead.

. . . .

Therefore, Dryden failed to demonstrate a reasonable probability he would not have pleaded guilty and would have insisted on going to trial had counsel done further DNA testing.  Accordingly, we conclude the district court did not err in denying this claim.[154]

### b. Analysis

The Nevada Court of Appeals' application of *Strickland's* performance prong to the state-court record in rejecting this claim was objectively reasonable.  Counsel's decision to forego the pursuit of a DNA test for Huggins was a reasonable strategic decision based on counsel's perspective at the time.  Dryden admitted to police that he hit and stomped on Kelly's face and dropped his knee on Kelly's head until he realized Kelly was dead.  The pathologist testified that those actions were consistent with the strangulation and multiple injuries that killed Kelly. Based on Halstead's testimony that he saw a third individual at the scene and police found unidentified male DNA at the scene, counsel investigated every potential witness.  Counsel also gathered and tested DNA for Garrison, whom Dryden adamantly claimed was Kelly's killer, but the results were negative.  When Dryden later told counsel that Huggins was responsible for Kelly's death, counsel interviewed Huggins only to find he was at a nearby gas station at the time.  Counsel's decision not to pursue a court order to test Huggins's DNA was based, among other things, on counsel's perspective that counsel lacked sufficient facts to tie Huggins to the crime scene, and counsel denied telling Dryden that Huggins's DNA was tested and excluded. Counsel's trial strategy was to emphasize the presence of unidentified DNA and Halstead's testimony that he saw a third person at the scene.  Under the totality of the circumstances, the

---

[154] ECF No. 27-44 at 2–4.

Nevada Court of Appeals reasonably applied *Strickland*'s performance prong in determining

counsel's failure to pursue a DNA test for Huggins did not constitute deficient performance.

The Nevada Court of Appeals also reasonably applied *Strickland*'s prejudice prong in

determining there was no reasonable probability that Dryden would have gone to trial for open

murder instead of pleading guilty to second-degree murder had counsel requested a DNA test for

Huggins.  Raso heard Dryden threaten to "beat the hell" out of Kelly for trying to steal Dryden's

girlfriend and saw Dryden "shove" Kelly.  Halstead said that the man on top "had a pretty good

choke hold" and was struggling to hold another man down in a "full Nelson" at the scene of

Kelly's death.  Smith testified that Dryden arrived at her apartment covered in blood and

confessed he killed two men for raping Becker.  The pathologist testified that Kelly suffered

more than a hundred blows—mostly to his face and neck—and died of strangulation due to

pressure, such as a choke hold.  And Dryden told police that he repeatedly punched Kelly and

dropped his knee onto Kelly's head until he realized Kelly was dead.  Although an unidentified

individual's DNA was mixed with Kelly's blood on a nearby street curb, even if that individual

had been identified, there is no way to discern when that individual's DNA was deposited on the

curb.  Given the overwhelming evidence of Dryden's guilt, there is no reasonable probability that

Dryden would have chosen to go to trial for open murder and, as he indicated at his change-of-

plea hearing, run the risk that he would be sentenced to imprisonment for 20 years to life, rather

than, as he did, plead guilty to second-degree murder with a stipulated sentence of 10 years to

life imprisonment.  Because the Nevada Court of Appeal's application of *Strickland* to this

record was objectively reasonable, Dryden is not entitled to federal habeas relief for ground B.

**C.    Certificate of Appealability**

The right to appeal from the district court's denial of a federal habeas petition requires a

certificate of appealability.  To obtain that certificate, the petitioner must make a "substantial

showing of the denial of a constitutional right."[155]  "Where a district court has rejected the

constitutional claims on the merits," that showing "is straightforward: The petitioner must

_____

[155] 28 U.S.C. § 2253(c).

demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[156]  Because I have rejected Dryden's constitutional claims on their merits and he has not shown that this assessment of his claims is debatable or wrong, I find that a certificate of appealability is unwarranted in this case.

## Conclusion

IT IS THEREFORE ORDERED that the petition **[ECF No. 15] is DENIED,** and because reasonable jurists would not find this decision to deny this petition to be debatable or wrong, and reasonable jurists would not debate my determination that ground C is unexhausted **[ECF No. 36]**, a **certificate of appealability is DENIED**.

IT IS FURTHER ORDERED that the Clerk of Court is directed to **SUBSTITUTE** Calvin Johnson for Respondent James Dzurenda, ENTER JUDGMENT accordingly, and CLOSE THIS CASE.

Dated: March 23, 2022

_____
U.S. District Judge Jennifer A. Dorsey

---

[156] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

29